UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

 PHILLIP DOYLEY, et al.,

                    Plaintiffs,            **MEMORANDUM & ORDER**
                                           20-CV-3109(EK)(MJ)

            -against-

 CITY OF NEW YORK, et al.,

                    Defendants.

-------------------------------------x
ERIC KOMITEE, United States District Judge:


        Plaintiffs Phillip Doyley, Latoya Doyley, and their

minor child, K.G., bring claims under 42 U.S.C. § 1983 for

violations of their Fourth and Fourteenth Amendment rights

against the City of New York and eleven individual police

officers.[1]  They also assert state-law claims for false arrest

and false imprisonment.  *Id.*  The plaintiffs allege that the

defendants executed a search warrant on their home in an

unreasonable manner, including by forcing Latoya Doyley to

remain unclothed for a period of time in the presence of

officers and by removing Phillip from the premises without

justification.

---

[1] The defendants are the City of New York, Detective Brandon Agosto,
Detective Ramon Garcia, Detective Etasham Khan, Captain Roderick Dantini,
Detective Howard Kwok, Detective Derek Sambolin, Detective Vincent Ferrante,
Detective Edward Washa, Detective Warren Brown, Captain Paul Muggeo, and
Detective Stephen Jones.

All defendants now move for summary judgment, arguing that the plaintiffs have adduced insufficient evidence of any constitutional violation.  The individual defendants also contend that even if a constitutional violation occurred, they are entitled to qualified immunity as to Phillip Doyley's federal claims.

For the reasons that follow, the motions for summary judgment are GRANTED in part and DENIED in part.

## I.   Background[2]

Sometime around six in the morning on April 13, 2019, police officers executed a no-knock search warrant on the Doyleys' multi-story house in Queens.  Pl. 56.1 ¶ 2; Dep. Of Latoya Doyley ("Latoya Dep.") Tr. 36:16; Dep. Of Phillip Doyley ("Phillip Dep.") Tr. 36:15; McGuire Decl., Ex. D, Search Warrant for 135-16 221 Street, Queens, New York ("Search Warrant").  They obtained the warrant based on information that Andrew Doyley, Phillip Doyley's adult son, was selling narcotics in the area, and that evidence of such activity would be found at the Doyley home.  *See* Search Warrant.  The warrant authorized a

---

[2] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (ECF No. 72)) and plaintiffs' response to this statement ("Pl. 56.1" (ECF No. 75)).  The court views the facts in the light most favorable to the plaintiffs.  Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.

search of the entire Doyley house.  *Id.*  Although Andrew[3] was not in the residence at the time, Phillip, Latoya, K.G. (who was under the age of fourteen), and Phillip and Latoya's seven-month-old baby were upstairs.  Pl. 56.1 ¶¶ 8, 15.

After searching the first level for occupants, police officers went to the upper level and found plaintiffs, who were all in a single bedroom at the time.  *Id.* ¶¶ 13, 15, 19.  The parties diverge — or disagree outright — about at least three aspects of the ensuing events as to Latoya: (i) her state of dress when initially confronted by the officers; (ii) how long she remained in that state before being permitted to dress; and (iii) the sequence of events between her being handcuffed and her being permitted to dress.

The parties agree that Latoya was at least partially unclothed when officers first entered the bedroom.  Latoya Dep. Tr. 47:21-48:01; Dep. of. Det. Brown ("Brown Dep.") Tr. 51:15.  Latoya asserts that she was wearing "nothing" at the time.  Latoya Dep. Tr. 47:21-23.  Detective Brown stated that he did not remember exactly what she was wearing, but thought she had on "her underwear and I think maybe like a tank top."  Brown Dep. Tr. 51:15-52:11.  They do agree that Detective Brown

---

[3] Because Phillip, Latoya, and Andrew Doyley share a surname, this order refers to them by their first names.

3

remained in the room with Latoya and the two children during the execution of the search.  Pl. 56.1 ¶ 29.

The testimony diverges, however, regarding the length of time that Latoya remained unclothed in the officers' presence.  Detective Brown stated that Latoya was "partially clothed" for "[a]pproximately 30 to maybe 45 seconds."  Brown Dep. Tr. 15:15, 86:13.  In her deposition, Latoya expressed uncertainty about how long she was made to wait before dressing, stating: "I am not sure . . . approximately how long . . . ."  Latoya Dep. 48:6-8.  She elaborated that she "kept asking, can I just put something on, I feel uncomfortable."  *Id.*

This was not, however, Latoya's only evidence on this point.  Earlier, she had given testimony about the same events in a "50-h hearing" — an inquiry pursuant to state law as part of the claims process.  There, she estimated that she was allowed to dress only after approximately thirty minutes.  50-h Hr'g Testimony of Latoya Doyley ("Latoya 50-h") Tr. 26:3-20, ECF 76-5.

Finally, Detective Brown testified that officers permitted Latoya to dress *before* handcuffing her.  Brown Dep. Tr. 86:13-19.  Latoya, in contrast, asserts that she was handcuffed while completely naked, Latoya Dep. 47:21-25, and that in response to being handcuffed, she asked "can I get dressed, can I put some clothes on."  *Id.* 47:19-20.  She

additionally explained that, when she was ultimately allowed to dress she required the assistance of Detective Brown to do so, due to the handcuffs.  Latoya 50-h Tr. 26:3-20.

Meanwhile, one of the other officers handcuffed Phillip and brought him into another room shortly after the officers entered the second floor.  Pl. 56.1 ¶¶ 16, 30. Detective Agosto instructed Phillip to call Andrew and ask him to come home to babysit the children.  *Id.* at ¶¶ 30-31.  Andrew apparently agreed; once this call was complete, Phillip was escorted downstairs and outside to a prisoner van, which was parked in front of the Doyleys' house.  *Id.* ¶¶ 32-34.

Upon learning that Andrew was coming home, Detective Khan told Detective Kwok, who was assigned to the prisoner van at the time, to move the vehicle.  *Id.* ¶¶ 35-36.  Detective Kwok then drove the van, with Phillip inside, approximately three blocks away from the house.  *Id.* ¶¶ 37.  Phillip stayed at that location for approximately two hours, handcuffed the entire time.  He was directed to call Andrew four or five additional times while in the van.  *Id.* ¶¶ 42-43, 71.  Ultimately, the police drove the van back to the house, Phillip was released, and his handcuffs were removed.  *Id.* ¶ 45.  Andrew was already at the house when Phillip returned, and was placed under arrest for drug-related charges.  No one else at the premises was formally arrested.  *Id.* ¶¶ 47, 52, 53.

All told, the search lasted somewhere between two and three-and-a-half hours. *Id.* ¶¶ 42, 57. Officers recovered a plastic bag of cocaine, credit card skimming devices, laptops, over $500 in cash, a credit card embossing machine, cell phones, thirty-five fraudulent credit cards, twenty blank credit cards, and a gun cartridge during the search. *Id.* ¶ 49.

Plaintiffs filed suit in July 2020 and amended the complaint in February 2021. Following the conclusion of discovery, the defendants moved for summary judgment on all claims. Def.'s Mot. for Summary J., ECF 70.

## II.  Legal Standard

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is material for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4] *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 212 (2d Cir. 2001).

---

[4] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

The moving party has the burden of demonstrating the absence of a dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant carries that burden, at least in a *prima facie* sense, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). If the non-moving party fails to do so, the court should grant summary judgment.  In performing this analysis, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  And courts may not "weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005).

### III. Discussion

Defendants move for summary judgment on all of the plaintiffs' claims, arguing that the plaintiffs were not falsely arrested or imprisoned under either Section 1983 or New York law.  In particular, the defendants argue that (1) the plaintiffs' initial detention was proper, as it was made pursuant to a valid search warrant, (2) Latoya's claim that she was unclothed in front of a male defendant should fail, as no

7

reasonable jury could conclude, based on the evidence adduced, that the period of time was unreasonable, (3) Phillip's false detention claim should fail because he remained within the "immediate vicinity" of the home throughout, and (4) the officer plaintiffs are entitled to qualified immunity as to Phillip's claim of detention.  Defs.' Mem. of L. in Supp. of Defs.' Mot. for Summary J. ("Defs. Mem.").

## A.  Personal Involvement

Before proceeding to the merits, we consider the extent to which the plaintiffs have adduced sufficient evidence concerning the various defendants' "personal involvement" in the conduct underlying their claims.  It has long been "settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages" under Section 1983.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).  "There is no special rule for supervisory liability" in this context.  *Tangreti v. Bachman*, 983 F.3d 609, 618 (2d Cir. 2020).  Instead, the plaintiffs must demonstrate that "each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.* at 612 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

The amended complaint does not specify which causes of action are asserted against which defendants.  *See, e.g.*, Am. Compl. ¶ 75 (claiming that "[t]he individual defendants violated

plaintiffs' rights" in a variety of ways).  The defendants have thus sought summary judgment on several claims for failure to adduce any — let alone sufficient — evidence of personal involvement.  Those are: all claims against Captains Muggeo and Dantini, and against Detectives Jones, Washa, Ferrante, Sambolin, and Agosto.  Defs. Mem. 18-21.  In response, the plaintiffs provided some clarity: specifically, they continue to assert only that "Detective Brown violated Latoya Doyley's fourth amendment right," Pls. Mem. 4, and that Phillip is proceeding only against Defendants Agosto, Khan, Kwok and Garcia.  *Id.* at 11.

Thus, of the individuals who move for summary judgment for lack of involvement, the plaintiffs dispute only Detective Agosto.  Summary judgment is therefore granted in favor of defendants Dantini, Jones, Washa, Ferrante, Sambolin, and Muggeo.[5]

**B.   Legal Authority to Detain Incident to Search**

1.   Fourth Amendment Considerations

We thus proceed to consider defendant Brown and defendants Agosto, Khan, Kwok, and Garcia's motions for summary judgment on Latoya's and Phillip's claims, respectively, as well

---

[5] These defendants would be dismissed even absent the plaintiffs' concession, given the plaintiffs' abandonment of the claims against them. *See Fantozzi v. City of New York*, 343 F.R.D. 19, 32 (S.D.N.Y. 2022) ("Courts may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.").

as the City's motion as to all claims.  We begin with certain established legal principles concerning law enforcement officers' authority to detain the occupants of a premises subject to search.

Plaintiffs do not dispute the validity of the search warrant itself.  *See* Pl. 56.1 ¶ 6; Am. Compl., Ex. A.  And they acknowledge that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981); *see* Pl. Mem. of Law in Opp. to Defs. Mot. for Summary J. ("Pl. Mem.") at 5.  That detention is justified, despite the absence of probable cause to seize the affected individuals, for specific purposes articulated in *Summers*.  These are: the needs to (1) prevent the occupants' flight, in the event that incriminating evidence is discovered, (2) minimize risk of harm to officers, and (3) facilitate the orderly completion of the search.  *Summers*, 452 U.S. at 702-03.

The Supreme Court further explained that this authority to detain during a search "is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler v. Mena*, 544 U.S. 93, 98 (2005).  In other words, officers may, generally speaking, detain occupants who are not themselves

suspected of the crime being investigated. *Id.* This "categorical" approach extends only to the simple *authority* of officers to detain an occupant during a search warrant execution, not to the *method* of detention, which must still be reasonable. *Id.*

Here, plaintiffs assert that they were detained unreasonably — Latoya because (broadly speaking) she was not permitted to dress, and Phillip because he was removed from the search premises for an improper purpose. Am. Compl. Reasonableness is assessed objectively under the Fourth Amendment; it "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

This balancing does not lend itself to bright-line rules, and the Supreme Court has found that the "duration of a detention can, of course, affect the balance of interests under *Graham*." *Muehler*, 544 U.S. at 100. Among other things, it is settled that detention incident to search cannot continue beyond the duration of the search itself. *Id.* at 100-01; *Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). However, the Court has also explicitly found a "2-to-3-hour detention in handcuffs" during a search to be reasonable, given "the government's continuing

safety interest" throughout that period.  *Muehler*, 544 U.S. at
100.

This reasonableness analysis is informed by the
criminal conduct described in the warrant affidavit.  Of
relevance here, even when "no special danger to the police is
suggested by the evidence in [the] record, the execution of a
warrant to search for narcotics is the kind of transaction that
may give rise to sudden violence or frantic efforts to conceal
or destroy evidence."  *Summers*, 452 U.S. at 702.

    2.  New York State Law

"A § 1983 claim for false arrest, resting on the
Fourth Amendment right of an individual to be free from
unreasonable seizures . . . is substantially the same as a claim
for false arrest under New York law."  *Weyant v. Okst*, 101 F.3d
845, 852 (2d Cir. 1996).  A false arrest claim under New York
law requires a showing that "the defendant intentionally
confined him without his consent and without justification."
*Id.*  Further, the "common law tort of false arrest is a species
of false imprisonment," *Singer v. Fulton Cnty. Sheriff*, 63 F.3d
110, 118 (2d Cir. 1995), and the two may be treated as a single
claim, *Williams v. City of New York*, No. 10-CV-2676, 2012 WL
511533, at *2 (E.D.N.Y. Feb. 15, 2012).  The parties do not make
independent arguments about the state law claims.  They are

therefore analyzed alongside the plaintiffs' constitutional claims.

## C.   Latoya's Privacy Claim

Latoya contends that her Fourth Amendment right to bodily privacy was violated when she was made to stand unclothed in front of a male officer during the search warrant's execution.  *See* Pl. Mem. 4-11.  Following the "personal involvement" colloquy described above, she now asserts this claim only against Detective Brown and the City.

The Second Circuit has recognized a "right to privacy in one's unclothed or partially unclothed body, regardless [of] whether that right is established through the auspices of the Fourth Amendment or the Fourteenth Amendment."  *Poe v. Leonard*, 282 F.3d 123, 138-39 (2d Cir. 2002).  The Supreme Court has applied the same principle, explaining that the detention of an unclothed occupant is reasonable only so long as officers do not "prevent[] [Plaintiffs] from dressing longer than necessary to protect their safety."  *Los Angeles Cnty., California v. Rettele*, 550 U.S. 609, 615 (2007).  In *Rettele*, the Court ultimately found it reasonable that the officers involved detained the occupants in a state of undress for two-to-three *minutes* while assessing potential danger.  Still, the Court added that "[t]his is not to say, of course, that the deputies were free to force [the occupants] to remain motionless and

13

standing for any longer than necessary.  We have recognized that special circumstances, or possibly a prolonged detention, might render a search unreasonable."  *Id.*

Lower courts have applied this reasoning to conclude that lengthier detention of unclothed occupants can violate the Fourth Amendment.  For example, the district court in *Brown v. City of New York* denied summary judgment on the basis that a plaintiff's detention without clothes for approximately forty-five minutes would violate her "clearly established right not to be detained in the nude for longer than necessary to achieve valid law enforcement purposes."  No. 11-CV-1068, 2013 WL 491926, at *7 (S.D.N.Y. Feb. 8, 2013) (citing *Summers*, 452 U.S. 692; *Muehler*, 544 U.S. 93; *Rettele*, 550 U.S. 609).

Similarly, a plaintiff's claim that she was made to stand nude for "maybe five to ten minutes" during a search survived summary judgment, as this span of time was longer than that in *Rettele*, and may have been longer than the officers needed to ensure their own safety under the circumstances. *Thomas v. City of New York*, No. 17-CV-8593, 2020 WL 6712306, at *4-*6 (S.D.N.Y. Nov. 16, 2020); *see also Scott v. City of New York*, No. 16-CV-834, 2020 WL 208915, at *11 (E.D.N.Y. Jan. 14, 2020) (denying summary judgment on a privacy claim when there was "no discernable reason why [the female plaintiff] had to

remain nude for several minutes . . . after she had expressed
that she was uncomfortable").

The question therefore is whether there is a genuine
dispute as to the length of time that Latoya was held unclothed
in the presence of male officers.  The relevant evidence comes
from the statements made by Latoya and Detective Brown.  Latoya
did not specify a particular length of time in her deposition in
this case.  When asked how long she was unclothed, Latoya
responded as follows:

> A.   I am not sure in, approximately how long, but I kept
>      asking, can I just put something on, I feel
>      uncomfortable.
>
> Q.   And do you know about how long you were handcuffed
>      without clothes?
>
> A.   I am not sure.

Latoya Dep. 48:6-11.  She also testified that she was wearing
"nothing" at the time that she was handcuffed.  *Id.* 46:21-25.

Before her deposition, however, Latoya sat for a 50-h
hearing pursuant to New York General Municipal Law 50h(1), which
calls for examinations of claimants in cases against
municipalities.  As defendants acknowledge, this testimony, too,
is cognizable on a motion for summary judgment.[6]  In her 50-h
examination, Latoya stated that she was detained while nude for

---

[6] *See Codling v. City of New York*, 68 F.App'x 227, 229 (2d Cir. 2003)
("A plaintiff's testimony in a 50-h hearing may be considered by the Court on
a motion for summary judgment."); Defs. Letter, ECF 87.

"[m]aybe 30 minutes." Latoya 50-h, Tr. 26:3. She further explained — consistently with her deposition testimony here — that because she was handcuffed, she was able to dress only with the aid of Detective Brown, which made her uncomfortable, and that the handcuffs were removed to allow her to put a shirt on and then refastened. *Id.* at 26:15-27:3.

In contrast, Detective Brown testified at his deposition that Latoya was unclothed for only about thirty to forty-five seconds, and was never handcuffed *while* undressed. Brown. Dep. 86:13-19. Brown argues that this length of time was reasonable to allow Detective Brown to calm Latoya and ensure she was not a danger to the officers. Defs. Mem. 11-12. This testimony contradicts Latoya's both in terms of the duration that she was unclothed, and the sequence of her handcuffing relative to being allowed to dress.

The defendants do not argue that Latoya's 50-h or deposition testimony should be disregarded. *See* Defs. Letter, ECF 87. It is true that in certain "rare circumstance[s]," a plaintiff's uncorroborated testimony may be insufficient to raise a genuine dispute of material fact. *Jeffreys*, 426 F.3d at 554. That would be the case, for example, when such testimony is squarely contradicted by either other objective evidence, or earlier statements made by the plaintiff. *See, e.g., Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 105 (2d Cir.

2011); *Cruz v. Reiner*, No. 11-CV-2131, 2013 WL 5676303, at *1
(E.D.N.Y. Oct. 16, 2013).  And several cases have found such a
contradiction when, for example, a plaintiff professes not to
remember a given fact in deposition testimony and then submits a
subsequent affidavit expressing a recollection of that fact.
*E.g.*, *Kennedy v. City of New York*, 570 F. App'x 83, 84-85 (2d
Cir. 2014); *Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 46 (2d
Cir. 2005); *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

     However, when the evidence presents "a question of 'he
said, she said,' . . . the court cannot . . . take a side at the
summary judgment stage."  *Fincher v. Depository Tr. & Clearing
Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Vital v.
Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999)
("Assessments of credibility and choices between conflicting
versions of the events are matters for the jury, not for the
court on summary judgment.").  The Second Circuit has held that
"[i]f there is a plausible explanation for discrepancies in a
party's testimony, the court considering a summary judgment
motion should not disregard the later testimony because of an
earlier account that was ambiguous, confusing, or simply
incomplete."  *Langman Fabrics v. Graff Californiawear, Inc.*, 160
F.3d 106, 112 (2d Cir. 1998); *see also Frost v. New York City
Police Dep't*, 980 F.3d 231, 246 (2d Cir. 2020) ("[W]here the
contradictions are not real, unequivocal, and inescapable, the

general rule remains that a district court may not discredit a witness's deposition testimony [or declaration] on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury."); *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (two sets of deposition testimony should have been considered because they were "only arguably contradictory").

Here, Latoya's two statements are in tension with one another as to the precise timing.  But they are not directly inconsistent.  She asserted in both contexts that she was handcuffed before being allowed to dress.  And she was consistent in her assertion that she remained unclothed for some length of time during which she was uncomfortable and requested clothing.  Her deposition testimony can be read to suggest, among other things, that she remained unclothed in at least two locations — "at first," when she was face-down on the floor by the left side of the bed, and "then," after she asked to change positions, sitting down.  Latoya Dep. 47:7-16.  As noted above, even short periods of unclothed detention can suffice for liability on a privacy claim if the record reveals insufficient reason for the given duration.  *See Thomas*, 2020 WL 6712306, at *4-*6 (unclothed detention of "maybe five to ten minutes" sufficient to survive summary judgment); *see also Scott*, 2020 WL 208915, at *11 (same for unclothed detention lasting "several

minutes"). Thus, this testimony — taken together with Latoya's 50-h testimony — is sufficient to survive summary judgment.[7]

The defendants also argue that the relevant question is not how long Latoya was unclothed, but rather the amount of time she was *witnessed* unclothed. *See* Defs. Letter, ECF 87 at 3 (citing *Hutchinson*, 436 F. App'x 210, 216 (4th Cir. 2011) ("There, Ms. Hutchinson alleges, she was required to lie naked on the floor, *in the presence* of her stepfather, brother, fiancé, and eight male officers, for an unnecessary and unreasonable period of time.")); *Thomas*, 2020 WL 6712306, at *5. Because Detective Brown testified that he witnessed Latoya unclothed for less than a minute, and the record does not establish that other officers witnessed her nude, defendants argue, there is no material dispute. However, both Detective Brown and Latoya stated that Detective Brown remained in the room with her for the duration of the search, which lasted roughly two to three and a half hours. Brown Dep. 87:9-11 ("I don't remember exactly how long it was. But I know I was with her the entire search warrant."); Latoya Dep. 54:11-13. Thus, a jury could reasonably conclude that, if Latoya was nude for an

---

[7] In this context, it is worth noting that Detective Brown, too, acknowledged uncertainty in his deposition testimony about the unclothed detention. *See, e.g.*, Brown Dep. Tr. 51:20-23 (testifying that Latoya was "[p]artially clothed. If I remember correctly, she was in like her underwear and I think maybe like a tank top, if I remember correctly. I don't remember.").

unreasonable period, that occurred *in the presence* of Detective Brown.

Based on this factual dispute, defendants have failed to carry their burden of demonstrating no genuine dispute of material fact.  The motion for summary judgment is therefore denied as to Latoya's claims of violation of bodily privacy.

## D.   **Phillip's Detention Claim**

Phillip claims that his detention in the prisoner van constituted false arrest and imprisonment, and violated his Fourth and Fourteenth Amendment rights.  Am. Compl. ¶¶ 59, 61-68, 75.  On this claim, he is proceeding against defendants Agosto, Khan, Kwok, and Garcia, as well as the City.  The defendants respond that no reasonable jury could conclude that a constitutional violation occurred.  In addition, the individual defendants argue that even if a constitutional violation could be established, it would not be a violation of "clearly established" law, and they are thus entitled to qualified immunity.  I consider these arguments in turn.[8]

_____

[8] District courts are of course free to take up the issue of qualified immunity — whether the constitutional principle underpinning the alleged violation was clearly established — prior to assessing the violation itself. *Pearson v. Callahan*, 555 U.S. 223 (2009).  Here, however, it is beneficial to first examine the question of whether a violation occurred, as the City remains a defendant as to these claims and is not entitled to qualified immunity.  Further, the assessment of the violation informs the qualified immunity analysis below.

1.   <u>Whether a Constitutional Violation Occurred</u>

Phillip invokes the Supreme Court's decision in
*Bailey*, *supra*, for the proposition that a detention conducted
outside the "immediate vicinity" of the search premises is
constitutionally unreasonable.  568 U.S. 186 (2013).  In
addition to this "spatial" limitation on detention incident to a
search, Bailey also recognized a temporal limitation: "Because
detention is justified by the interests in executing a safe and
efficient search, the decision to detain must be acted upon at
the scene of the search and not at a later time in a more remote
place."  *Id.* at 201-02.

a.   Spatial Considerations

As regards the spatial issue, *Bailey* presented the
reverse situation from Phillip's: there, the individuals were
detained far outside the search premises and brought *back to*
them.  Specifically, two occupants left the subject apartment
before the search began, but officers followed them and stopped
them "about a mile" from the location of the search.  *Id.*  The
Supreme Court found that this detention did not fit any of the
justifications laid out in *Summers* – namely, ensuring the safety
of the officers conducting the search, preventing flight, or
allowing for orderly completion of the search.  *Id.* at 196-97.
Phillip invokes this holding to argue that moving him three
blocks *from* the house contravened the Fourth Amendment.  The

21

defendants argue that Phillip was in fact at all times within the "immediate vicinity" of the searched premises — even parked three blocks away.  Defs. Mem. 13-15.

The Supreme Court declined to define "immediate vicinity" in *Bailey*, given its view that the distance from the premises in that case was "beyond any reasonable understanding of the immediate vicinity of" the search premises.  568 U.S. at 201.  The Court did, however, provide some guidance:

> In closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors.

*Id.*

Based on these factors, it is overwhelmingly likely that Phillip remained within the "immediate vicinity" of the house when he was *initially* placed in the prisoner van directly in front of the house.  Pl. 56.1 ¶ 12; *see Muehler*, 544 U.S. at 96 (occupant was removed from her bedroom, where she was sleeping, to a "converted garage" on the premises); *Summers*, 452 U.S. at 702 n. 16 ("We do not view the fact that respondent was leaving his house when the officers arrived to be of constitutional significance. The seizure of respondent on the sidewalk outside was no more intrusive than the detention of those residents of the house whom the police found inside.");

*United States v. Broussard,* 80 F.3d 1025, 1033 (5th Cir. 1996) (defendant remained in immediate vicinity when he "was taken to the driveway while officers searched the house and garage").

The defendants argue that this was true even after the van was moved, given that they parked an "approximately one minute [] drive" or "three to four minute[]" walk from the Doyley home.  Pl. 56.1 ¶¶ 37, 39-41.  This view is probably wrong.  Cases in this circuit that have held distances similar to, or even closer than, the three-block distance here to be outside the immediate vicinity of a search premises.

One district court found the detention of an individual "around the block" from a searched location to be outside the immediate vicinity.  *Cabral v. City of New York*, No. 12-CV-4659, 2014 WL 4636433, at *4 (S.D.N.Y. Sept. 17, 2014), *adhered to,* No. 12-CV-4659, 2015 WL 4750675 (S.D.N.Y. Aug. 11, 2015), and *aff'd,* 662 F. App'x 11 (2d Cir. 2016).  Another judge came to the same conclusion regarding a detention conducted only 100-200 feet from the given premises, given the government's failure to justify the need for such a detention under the *Summers* factors.  *United States v. Gildersleeve*, No. 11-CR-211A, 2013 WL 1908049 (W.D.N.Y. Apr. 19, 2013), *report and recommendation adopted*, No. 11-CR-211A, 2013 WL 1908310

(W.D.N.Y. May 7, 2013).[9]  Given the considerations laid out in *Bailey*, and the thrust of subsequent case law, it seems clear that Phillip was removed from the "immediate vicinity" of his home.

Importantly, the decision to move the prisoner van (with Phillip inside) cannot be supported by *Summers*' justifications for detention incident to search.  At oral argument in this case, the court requested that the defendants submit a letter pointing to any record evidence that would explain *why* Phillip was placed in the van and then driven away from the house.  ECF Dkt. Entry Dated 1/10/2024.  The defendants responded simply that "it is common practice to remove occupants of a home to a prisoner van once they are detained pursuant to a search warrant" to prevent the destruction of contraband or evidence.  ECF 87 at 2.  This may explain why Phillip was removed to the van, but it does not explain the need to move the van itself to a further location (let alone point to relevant evidence).

In their brief, the defendants argue that it was reasonable to move the van because the officers had learned that Andrew was coming home, and they wanted to prevent him — Andrew — from fleeing or becoming aggressive upon his return.  Defs.

---

[9] *But cf. Thomas v. City of New York*, No. 14-CV-7513, 2019 WL 3491486, at *5 (E.D.N.Y. July 31, 2019) (finding that alleys behind the backyard of an apartment and abutting the premises were within the immediate vicinity).

Mem. 14.  This rationale does not comport with the established purposes for detention incident to search.  As the Court wrote in *Bailey*, "[e]ven if" the challenged detention "could facilitate a later arrest if incriminating evidence is discovered, the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment."  568 U.S. at 199 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393, (1978)); *see also id.* at 206 (Scalia, J., concurring) (noting that "the ordinary interest in apprehending suspects" does not support application of the *Summers* exception).

For these reasons, the decision to *move* Phillip in the van was not authorized by *Summers* or its progeny.  That does not necessarily mean, however, that it was unconstitutional.  Unlike the defendant in *Bailey*, whose case establishes the limiting principle on *Summers* that is at issue here, Phillip was appropriately detained incident to the search in the first instance.  *See Bailey*, 568 U.S. at 193 (distinguishing "*Summers* and later cases" on the basis that "the occupants detained were found within or immediately outside a residence *at the moment* the police officers executed the search warrant") (emphasis added).  The parties here agree as much.  And so the analysis of whether Phillip's constitutional rights were violated must focus

on the *incremental* burden imposed by his being moved three blocks.

This need to focus on incremental burden is one lesson of *Summers* itself.  *Summers* held that detention incident to search is constitutional because (among other things) it "represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant."  452 U.S. at 703.  Likewise, in *Muehler*, the Section 1983 plaintiff complained that, after detaining her incident to search, the officers proceeded to question her about her immigration status.  The Court held that this contention rested on the "faulty" premise that such questioning constituted a "discrete Fourth Amendment event" at all.  544 U.S. at 100-01.  Here, given that Phillip had already been lawfully seized per *Summers*, it is not immediately clear that the incremental three-block move constituted a new Fourth Amendment event, either.

In the end, this particular question does not need to be resolved, because — for the reasons set out in Section E, below — the individual officers are entitled to qualified immunity on the claim that Phillip's detention in the van violated the *spatial* limitations established in *Bailey*.  Thus, we proceed to consider whether Phillip's detention violated the *temporal* limitations in Bailey and its progeny.

b.   Temporal Restrictions

*Bailey* suggests a temporal limitation on the authority to detain incident to search, in addition to the spatial limitation discussed above.  The Court concluded in *Bailey* that it was "necessary to confine the *Summers* rule to those who are present *when* and where the search is being conducted."  568 U.S. at 197 (emphasis added); *see also Muehler*, 544 U.S. at 101 ("As the Court of Appeals did not hold that the detention was *prolonged* by the questioning [about plaintiff's immigration status], there was no additional seizure within the meaning of the Fourth Amendment.") (emphasis added).

The record suggests a sufficient basis from which a jury could conclude that Phillip's detention was *prolonged* by the ulterior effort to arrest Andrew.  For example, the parties agree that Phillip called Andrew four or five times, at the instruction of police, during the two hours that he was confined to the prisoner van.  Pl. 56.1 ¶ 42-43.  They further agree that Phillip was driven back to the house only after Andrew had arrived, and that Andrew was arrested at the scene.  *Id.* ¶¶ 45-47.  Finally, the complaint alleges that Andrew arrived home sometime after 8:49 A.M., and Phillip was brought back sometime *after* that and asked to sign the search warrant, following which the officers left the house at about 9:30 A.M.  Am. Compl. ¶¶ 66-73.  This indicates that the search of the home may have

been completed by the time Phillip was returned and released —
perhaps significantly earlier.  Therefore, it is possible that
Phillip's detention was impermissibly prolonged.  Phillip may
present this question to the jury.

### E.   Qualified Immunity

The defendants argue that the individual defendants
are entitled to qualified immunity on Phillip's claims.  Defs.
Mem. 15-18.  In this context, too, I consider the two theories
on which his detention would have violated the Fourth Amendment
(spatial and temporal) separately.

"A police officer is entitled to qualified immunity
where (1) his conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known, or (2) it was objectively reasonable for him
to believe that his actions were lawful at the time of the
challenged act." *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d
Cir. 2007).  In assessing this standard, the Supreme Court has
admonished courts "not to define clearly established law at a
high level of generality, since doing so avoids the crucial
question whether the official acted reasonably in the particular
circumstances that he or she faced." *Plumhoff v. Rickard*, 572
U.S. 765, 779 (2014).  Given these dictates, it is of course
incumbent on a court that would deny qualified immunity to state
the clearly established legal principle that a reasonable jury

28

could — on the facts alleged or adduced — find a given defendant
to have violated.

      *Spatial violations of the* Bailey *rule.*  As discussed
above, *Bailey* clearly established the proposition that a
claimant's Fourth Amendment rights are violated when he or she
is initially detained incident to a search warrant execution
outside the immediate vicinity of the searched premises.
However, neither the parties nor the court has identified a case
in which such a violation was found when the claimant is
initially detained within the searched premises, pursuant to
*Michigan v. Summers*, and removed from the immediate vicinity
thereafter, as was the case here.

      The difference matters because, as noted above, it is
undisputed in this case that the detention at issue was
*initially* authorized.  Thus the constitutional violation, if one
were to have occurred in this instance, would have arisen from
the incremental effect of Phillip's having been driven the three
blocks at issue.

      The plaintiff has pointed to no clearly established
law that would support such a violation.  And there is some
authority that is, if anything, to the contrary: *See Illinois v.
Caballes*, 543 U.S. 405 (2005); *Muehler*, 544 U.S. 93 (2005).
Likewise, the continuation of at-home detention during a search
is less likely to carry stigmatic harm than detention on the

street.  *See Bailey*, 568 U.S. at 200.  Here, Phillip was already in the van at the time it was moved, and there is no indication that anyone could see in, or that the moving of the van three blocks away made his detention *more* public.

Therefore, "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Dancy v. McGinley*, 843 F. 3d 93, 106 (2d Cir. 2016).  Given the lack of case law directly on point, the individual defendants are entitled to qualified immunity with respect to Phillip's claims that the *spatial* element of his detention constituted a violation, and the motion for summary judgment as to these claims and these defendants is granted.

*Temporal violations of the* Bailey *rule.*  It is clearly established, however, that a detention incident to search cannot proceed *longer* than the length of the search itself.  *See* discussion above in Section D.1(b) (citing *Bailey*, 568 U.S. at 197; *Muehler*, 544 U.S. at 101).

As noted above, the factual record at this stage is such that a reasonable jury could conclude that the endpoint of Phillip's detention coincided with Andrew's arrest, rather than the completion of the search.  In particular, Phillip was detained in the van for two hours, made to call his son four or five additional times, was only returned after Andrew had

30

arrived back home and was being arrested, and the officers left
shortly thereafter.  Pl. 56.1 ¶¶ 42-47; Am. Compl. ¶¶ 66-73.
Accordingly, summary judgment is denied with respect to the
alleged temporal violations of Phillip's detention.

**F.   The City's Liability**

Defendants do not argue that the City should not be
held liable under *Monell*.  Nor could they, on this record.
*Monell* dictates that a municipality does not have *respondeat
superior* liability for the constitutional violations of its
agents.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436
U.S. 658, 691-94 (1978).  Instead, municipality liability
requires that the violation result from a "policy or custom."
*Id.* at 694.  Thus, the "critical question" is "whether there is
sufficient evidence in the record of municipal policy, custom,
or practice, so that a jury could reasonably infer that the
individual conduct in this case was causally connected to the
policy."  *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d
Cir. 1991); *see also Piotrowski v. City of Houston*, 237 F.3d
567, 579 (5th Cir. 2001) (a policy or custom under *Monell* can be
demonstrated by "a persistent, widespread practice of City
officials or employees").

Here, in their supplemental letter to the court, the
city's attorneys *expressly acknowledge* such a policy or custom.
They wrote that "it is common practice to remove occupants of a

home to a prisoner van once they are detained pursuant to a search warrant," ECF 87 (quoting Deposition Tr. of Detective Agosto, 65:10-66:6), and that "it is appropriate for Your Honor to conclude that plaintiff Phillip Doyley's removal from the home was . . . consistent with NYPD's policy," *id.*; *see also* Khan Deposition Tr. 66:3-9 ("[M]ost of the time pending the search of the premises, we do remove the occupants so we can conduct the search.").  This acknowledgment does not indicate whether or not it is NYPD practice to drive the prisoner van away from the search premises once a detainee is inside, which is ultimately the basis for the constitutional violation in this case.  However, given the defendants' failure to assert a defense under *Monell*, and the evidence from defendants themselves suggesting that it is city policy to at least remove detainees from search premises, the motion to dismiss Phillip's detention claims as to the City is denied.[10]

## G.   Alleged Threats to Remove the Doyleys' Children

In their complaint and opposition brief, the plaintiffs appear to reference a constitutional violation based on the fact that the defendants allegedly threatened Latoya and Phillip Doyley with the removal of their children if they did

---

[10] It may be — or many not — that Phillip's damages are limited; it remains unclear at this stage how he was harmed by the incremental step of driving the prisoner van three blocks from his house.  It is possible he was detained longer than necessary to complete the search.  Moreover, nominal damages are appropriate.  *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978).

not cooperate with police instructions, including signing the
search warrant and calling Andrew.  Am. Compl. ¶¶ 55, 75
(alleging that "defendants violated plaintiffs' rights,
guaranteed to them by the fourth and fourteenth amendments" in
part because they "threatened to take their children from
them"); Pls. Mem. 14-15.  While the plaintiffs argue that such
alleged coercion was "violative of the due process clause of the
fourteenth amendment," *id.*, they cite no authority for this
proposition.  Instead, they cite two criminal cases in which
similar remarks regarding the removal of children were used to
coerce confessions.  *See Lynumn v. Illinois*, 372 U.S. 528
(1963); *United States v. Tingle*, 658 F. 2d 1332 (9th Cir. 1981).
But no such violation is at issue here, and the Amended
Complaint contains no independent cause of action relating to
this alleged conduct.  Am. Compl.  Given the lack of clear
grounds for this alleged violation, the motion for summary
judgment is granted as to the plaintiffs' coercion claim.

**H.   K.G.'s Claims**

The plaintiffs have likewise abandoned any claims
brought by K.G. by failing to demonstrate a violation of the
child's rights and failing to respond to the defendants'
argument for dismissal.  Defs. Mem. 7-10*; see generally*, Pl.
Mem.; *Fantozzi*, 343 F.R.D. 19.  Therefore, the motion to dismiss
K.G.'s claims is granted.

**IV.   Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment is DENIED as to Latoya's claim for violation of her bodily privacy against Detective Brown and the City of New York and as to Phillip's claim against the City of New York that his removal from the home in the prisoner van constituted false imprisonment and a violation of his constitutional rights. Finally, the motion is DENIED as to Phillip's claim against Detectives Agosto, Khan, Kwok, and Garcia that his detention violated the temporal limits of reasonable seizure.  The motion is GRANTED as to all other claims.


SO ORDERED.



   /s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:   March 5, 2024
         Brooklyn, New York